IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


KELLY F. SHUPPE

          Plaintiff,

      v.                               Civil Action No. 5:07-cv-57

MICHAEL J. ASTRUE,
Commissioner of Social Security,

          Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**


**I. Introduction**

A.     Background

      Plaintiff, Kelly F. Shuppe, (Claimant), filed her Complaint on May 7, 2007, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on

September 19, 2007.[2]  Claimant filed her Motion for Summary Judgment on February 28, 2008.[3]

Commissioner filed his Motion for Summary Judgment on April 25, 2008.[4] [5]

B.     The Pleadings

      1.     Plaintiff's Brief in Support of Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 5.

[3] Docket No. 15.

[4] Docket No. 18.

[5] Docket No. 15

2. <u>Defendant's Brief in Support of His Motion for Summary Judgment</u>.

C.     <u>Recommendation</u>

I recommend that:

1.     Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because substantial evidence supports the ALJ's credibility analysis; substantial evidence supports the ALJ's conclusion Claimant's hypothyroidism and it symptoms were not disabling; and there is no evidence the ALJ was biased or prejudiced against Claimant.

2.     Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons set forth above.

## II. Facts

A.     <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits on February 4, 2004, alleging disability since June 2, 2000 due to possible multiple sclerosis (MS), hypothyroidism, and being "constantly sick with infections." (Tr. 187-91, 200). The application was initially denied on April 19, 2004 and upon reconsideration on June 11, 2004. Claimant requested a hearing before an ALJ and received a hearing on May 26, 2005.[6] At the hearing, Claimant amended her alleged disability onset date to June 30, 1995. On June 30, 2005, the ALJ issued a decision adverse to Claimant. Claimant requested review by the Appeals Council but was denied. Claimant filed this action, which proceeded as set forth above.

B.     <u>Personal History</u>

---

[6] At the hearing, Claimant was represented by Scott Kernoot, Esq.. Presently, Claimant is not represented by counsel.

Claimant was 42 years old on the date of the May 26, 2005 hearing before the ALJ.

Claimant completed college and has prior work experience as a registered nurse.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: June 30, 1995 through June 30, 2000[7]:

**Dr. Wilbur Sine, M.D., 1/16/96  (Tr. 256)**
Subjective: Hypothyroidism is well controlled, asymptomatic.  She is losing weight with the
Adipex.  Will continue it until she gets down to 165.
Plan: Will recheck her thyroid.

**Dr. Wilbur Sine, M.D., 5/30/95  (Tr. 258)**
Subjective: Much better with the current medication for thyroid.  Feels better and is losing
weight.

**Dr. Wilbur Sine, M.D., 3/17/95  (Tr. 259)**
Plan: Get thyroid profile.

**Dr. Wilbur Sine, M.D., 3/9/95  (Tr. 260)**
Review of systems: Neuropsychiatric: the patient denies any difficulty with sleeping, anxiety,
depression, nervousness, memory loss or confusion.

**Dr. James Gainer, M.D., 12/11/96 (Tr. 266)**
Assessment: 1) Sinusitis; 2) Hypothyroidism.
Plan: . . . Will contact her next week regarding adjustment of thyroid dosage.

**Dr. James Gainer, M.D., 10/23/96 (Tr. 267)**
Assessment:
1) Hypothyroidism with iatrogenics hypothyroidism due to excessive Synthroid replacement.
Recheck TSH today on decreased dose.  Will adjust dosage based on this.
2) History of abnormal PAP smears.  Status post cone biopsy and cryotherapy.  Repeat PAP
smear done today.  No visual evidence of dysplasia.
3) Fatigue and other constitutional symptoms improved with decreased Synthoid.

**Dr. James Gainer, M.D., 8/14/96 (Tr. 268)**

_____

[7] Claimant was last insured on June 30, 2000.  Accordingly, Claimant's receipt of
benefits is conditioned on her ability to prove she was disabled at any point between June 30,
1995 through June 30, 2000.  See 20 C.F.R. §§ 404.130-132.

Assessment:
1) Hypothyroidism, on Synthoid with repressed TSH indicating excessive Synthoid replacement.
2) Fatigue, rule out depression.

**Dr. James Gainer, M.D., 6/24/96 (Tr. 270)**
Assessment:
1) Hypothyroidism
2) Allergic rhinitis.
3) History of cervical dysplasia.

**Primary Care Center of Mr. Morris, 10/28/00 (Tr. 288)**
Assessment: Hypothyroidism

**Primary Care Center of Mr. Morris, 7/15/00 (Tr. 291)**
Assessment: Hypothyroidism

**Primary Care Center of Mr. Morris, 5/20/00 (Tr. 292)**
Subjective: No fatigue or pain.
Assessment: Hypothyroidism

**Primary Care Center of Mr. Morris, 4/15/00 (Tr. 293)**
Subjective: Patient feels much better.  Feels much less fatigued.
Assessment: Hypothyroidism

**Primary Care Center of Mr. Morris, 3/18/00 (Tr. 294)**
Subjective: Patient feels better.
Assessment: Hypothyroidism

**Primary Care Center of Mr. Morris, 2/19/00 (Tr. 298)**
Subjective: Patient doing well.
Assessment: Hypothyroidism

**Primary Care Center of Mr. Morris, 1/15/00 (Tr. 299)**
Subjective: No fatigue, except secondary to flu.
Assessment: Hypothyroidism

**Primary Care Center of Mr. Morris, 12/11/99 (Tr. 300)**
Subjective: Patient complaints of decreased hearing in right hear. She denies other symptoms and other problems today.
Assessment: Hypothyroidism

**Primary Care Center of Mr. Morris, 8/28/99 (Tr. 302)**
Subjective: She denies fatigue.

<u>Assessment</u>: Hypothyroidism

**Primary Care Center of Mr. Morris, 7/23/99 (Tr. 303)**
<u>Assessment</u>: GERD. Possible irritable bowl syndrome.

**Primary Care Center of Mr. Morris, 5/12/99 (Tr. 305)**
<u>Assessment</u>: Hypothyroidism. Chronic sinusitis. Perimenopausal.

**Primary Care Center of Mr. Morris, 7/7/98 (Tr. 319)**
<u>Assessment</u>: Obesity, weight control.

**Primary Care Center of Mr. Morris, 2/19/98 (Tr. 326)**
<u>Assessment</u>: Improving attitude. Hypothyroidism.

**Primary Care Center of Mr. Morris, 6/11/97 (Tr. 337)**
<u>Assessment</u>: Refill meds. Hypothyroid. Chronic sinusitis.

**Primary Care Center of Mr. Morris, 4/28/97 (Tr. 340)**
<u>Assessment</u>: Revolving bronchitis. Hypothyroidism.

**Primary Care Center of Mr. Morris, 3/08/97 (Tr. 344)**
<u>Assessment</u>: Chronic sinusitis. Hyperlipidism. Hypothyroidism.

**Primary Care Center of Mr. Morris, 1/16/97 (Tr. 348)**
<u>Assessment</u>: Hypothyroidism. High cholesterol. Obesity. Allergies Environmental/___.

**Dr. Larry Carson, M.D., 7/31/03 (Tr. 375)**
<u>Assessment</u>: Gait ataxia, questionable early normal pressure hydrocephalus.

**Dr. Fulvio Franyutti, M.D., DDS Physician, 4/12/04 (Tr. 379)**
<u>Physical RFC Assessment</u>
Exertional Limitations: none established
Postural Limitations: none established
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: Unlimited
Symptoms: Records 12 mos prior to AOD (6/95) through DLI (6/00) do not show any significant functional limitations. Nonsevere through DLI (6/00).

**Dr. Matthew Cupp, M.D., 6/7/01 (Tr. 455)**
<u>Assessment/Plan</u>: 1) High LDL, 2) GERD, 3) Depression

**Dr. Matthew Cupp, M.D., 4/20/01 (Tr. 456)**

Subjective: Feels depressed. . . . Has no energy.
Assessment: Anemia, Hypokalemia, High LDL.

**Dr. Matthew Cupp, M.D., 12/4/00 (Tr. 459)**
Subjective: Mood much better. Sleep is OK.
Assessment: Hypokalemia, ___, Abdominal pain.

**Dr. Matthew Cupp, M.D., 11/14/00 (Tr. 460)**
HPI: Complains of fatigue. Feels tired all the time.
Assessment: PMS. IBD. Hot flashes.

**Dr. Joseph Selby, M.D., 5/6/96 (Tr. 485)**
Assessment: Seasonal allergic rhinitis mostly by history. Patient was sniffling on multiple occasions and it was obvious even from the hallway but I saw no rhinorrhea on exam. I am going to try a course of Zyrtec. I have also given her a prescription for Vancenase AQ two sprays each nostril AM and PM. She can call or return with problems or difficulty. Keep follow-up in about two weeks to two months, sooner if there are any problems. I also alerted her to symptoms of sinus infection especially with fever and facial pain, she should return sooner.

**Robert M. Gerbo, M.D., 1/12/95 (Tr. 486)**
Assessment: Maxillary sinusitis. Depression. Edema.

**Robert M. Gerbo, M.D., 11/18/94 (Tr. 487)**
Assessment: Depression. Fluid retention.

**Primary Care Center of Mr. Morris, 7/20/04 (Tr. 515)**
Assessment: 1) Neurological condition, 2) Osteoporosis, 3) GERD, 4) Depression, 5) Mixed Hyperlipidemia, 6) Hypothyroidism, 7) Anemia, iron deficiency, unspecified.

**Dr. Matthew Cupp, M.D., 2/1/05 (Tr. 521)**
To whom it may concern: This letter is in reference to Mrs. Kelly Shuppe. Mrs. Shuppe established herself as a patient in my medical practice on November 14, 2000. I have seen Mrs. Shuppe in my clinic on numerous occasions. Mrs. Shuppe is requesting that I write a letter with all her diagnosis as to which I have treated her. The following is the diagnosis: PMS, Irritable Bowl Syndrome, Hot Flashes, Hypothyroid, Hypertension, Abdominal Pain, Anemia, GERD, Depression, Carpal Tunnel, elevated LDL, Adult ADD, Hypokalemia, Yeast Vaginitis, Abnormal PAP, Anxiety Syndrome, Acute Sinusitis, and Peripheral Neuropathy.


D.    Testimonial Evidence

        Testimony was taken at the May 26, 2005 hearing. The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ATTORNEY] (Tr. 130)

Q        Okay.  Now, before we start talking about those - - I want you to explain to me what was going on in June of 1995.  What conditions were you suffering from in June of 1995?

A        The most would be my hypothyroid regulation.

ALJ            When did you stop working?  Let me just - -

CLMT          June of '95.

ALJ            That's when you quit?  Okay.  Okay.  That's for you and me.  That'll - - it's a reference point.  Okay.  Great.

CLMT          June of '95.

ALJ            Okay.

CLMT          And I did stop working then because I was ill.

Q        And we'll talk about that in a second, but for right now - - you, you know that you've had the hypothyroid problem before.

A        It, it was diagnosed in March of '95.

Q        Okay.  What other conditions do you recall suffering from in 1995, of the ones that you've already mentioned?  So, for example, the migraines - - did you have those in 1995?

A        Yes, yes.  Migraines - -

Q        Hold on.  Did you suffer from the irritable bowel syndrome - -

A        Yes.

Q        - - in 1995?

A        Yes.

Q       Did you suffer from the incontinence in 1995?

A       No.

Q       Did you suffer from the reflux disease problems in 1995?

A       Yes.

Q       Did you suffer from the pancreatitis issues in 1995?  And again, when I'm saying 1995 - - you know I mean June of 1995.

A       No.

Q       Okay.  So, not - - no as to the pancreatitis?

A       Correct.

Q       Did you suffer from the hypokalemia in 1995 - - June of '95?

A       Yes.

Q       Did you suffer from the anemia problems in June of 1995?

A       No.

Q       What was going on as far as the neuropathy symptoms in June of 1995?

A       Well, my - - this right leg of mine  - - the upper thigh muscle would - - it would just get incredibly sore sometimes and my, and my right toes would be numb off and on.

Q       And that was in June of 1995?

A       Yes.

Q       And when had you first noticed that problem?

A       It was, it was probably just a few months preceding that.  And, and I didn't think anything of it at the time.  I thought I'd pulled a muscle or something.

Q       All right.  And so, would you, would you characterize that particular problem as

progressive between June of 1995 and 2005?

A     Yes, absolutely.

Q     So, you've gotten progressively worse - -

A     Absolutely.

Q     - - with the neuropathy problem?

A     Yes.

                    *           *           *

Q     Okay.  Now, what problems were you having at work in June of 1995?  Or the spring of 1995?

A     Well, when I could get myself to work - - I, I missed work frequently because I was ill - - and when I could get myself to work, I just - - I had just lost all interest in, in everything that I was doing.  I just didn't look forward to going to work anymore.  I just - - I did a lot of teaching and I couldn't - - you know - - it was hard for me to pull my references out and do my teaching for that week.  To go on home visits, which I did, was very difficult.  It was like I just dreaded everything.  And I only worked part time.  They actually let me go down just to five hours a week and then I couldn't - - just couldn't even do that.  I, I was just so depressed and non-functional.  I just didn't feel like I was doing my job.  I, I had upset stomach all the time.  I, I would - - nausea, vomiting, diarrhea.  I would get short of breath so easily.  I would get dizzy, feel faint.  I mean, I'd be driving and have to pull over to the side of the road and, and just get my breath and get some air and I'd break out in sweats - - so hot.   Just get soaking wet.  Those, those kinds of things.

Q     When did those kinds of problems become unbearable?  When did it get to the

point when you first asked to be reduced from full time to part time?

A       Okay.  I'm not understanding.  I don't understand.

Q       When you - - when did those problems get to the point that it prevented you from working?

A       Well, I did quit work then because I didn't feel well.  In June of '95.

Q       And I'm asking before that - - had,  had the problems gotten bad?

A       Yes, that's, that's actually - - yeah, that's why I resigned at the hospital because I worked full time and in about '94, I just felt fatigued all the time.  It started in about '94.  All this - all these things and, I worked full time plus I was a staff nurse, I was assistant nurse manager and I just couldn't do my responsibilities anymore so, I went down - - I tried four days a week - -

Q       Okay.  When you - -

A       - - three days a week.

Q       - - hold on - - when you say that you couldn't do your, your responsibilities anymore - - what do you mean?

A       Well, just, just that, that's when I started being so fatigued.  I was constantly late for work.  I couldn't even, I couldn't even get to work on time and that became a problem.  I was addressed about that.  My missing work started to become a problem - - my call ins.

Q       Why were you missing work?

A       Sick at - - I mean, sick at home.  I was 100 pounds more than I am now.  And - -

Q       So, at that time - -

A       I, I was in the full throws of hypothyroid and no, nobody knew it.

Q       Okay.  Hold on a second.  So, at, at that time - - that is in about 1994 - - you

10

weighed about 285 pounds?

A    I'm sorry - - 265.

Q    All right.  And so, that would have been in 1994?

A    Um-hum.

Q    Right?

A    Right.  Well, maybe I was around 200 then, 200 then, but I remember when I - - at my highest weight.  I may have been '92.  I, I started weight slow, but - -

Q    Okay.  What was the, the cause of the weight gain?

A    Just hypothyroid.

Q    In what way?  How does that cause the weight gain?

A    All of - - all your - - your, your thyroid controls all of your systems.

ALJ    Yeah, that's a medical question anyway.  I think I know the - -

CLMT    All slow.

ALJ    - - basic answer.

CLMT    I mean, everything becomes sluggish.

ALJ    I understand.

Q    And so, then at that time you, you had this weight problem, you're starting to have the fatigue problem and you're missing a lot of work.  What were the other problems in 1994?

A    Well, depression.  I mean, you know depression was always there.  Now, I'm - - now, I'm where I can see that.  Oh, my goodness, I had OCD really bad.  I mean, there would be days at work that - - you, you push a medicine cart down the hall and you go to give your

medications, sign them off before you go in the patient room to give them and I couldn't get away from the cart. I had to keep checking to make sure I was signing off the medication. It, it would just increasing difficult. My attention span was terrible. I mean, I just had, like, slower movements. I couldn't get around as quickly. Like, I mentioned I was constantly late to work. I had a problem with - - I just - - I didn't - - I started having problems with authority. Like, you know, authority figure. My boss would try to address me with something. I was very angry all the time. Very angry at home even.

Q    And so, did you leave Ruby voluntarily or - -

A    I did. Um-hum. I left Ruby voluntarily.

Q    Why?

A    Well, I was - - because I was ill. I had done a fine job and I, I didn't want to stay there and do a half shot job. I, I mean, I couldn't do what I was doing for. And I thought - - and because it was very physical. Nursing is very physical - - down the hall nursing. I, I couldn't not do that anymore. I thought if I got to the Heath Department, it would be more like a - - in a desk situation.

Q    All right. And so, how did the Health Department situation work out?

A    (INAUDIBLE) it went well for a while. I mean, it was, it was better for a while because I immediately went from 40 hours plus a week to 20 hours. So, I got to catch up on my rest a little. But then - - you know - - little by little, I just kept getting worse.

Q    What do you mean by that?

A    Just everything, just everything kept getting worse and my psychological state, my - - these hot, these - - this hot - - I would get so hot flushed, constipated, nervous, upset

stomach and vomiting and either be constipated or diarrhea.

Q    How much did you weigh at that time when you were at the Health Department?

A    Well, I think it fluctuated.  I think, as best I remember, maybe between - - maybe around 188, 178, 188, somewhere - -

Q    Okay.  So, that represented a weight loss - -

A     - - somewhere in there.

Q     - - from when you were at Ruby?

A    Right, but then I think I started going up again.  Going up - -

Q    All right.  How long did you stay at the 20 hour a week (INAUDIBLE) when you were at the Health Department?

A    For two years.

Q    All right.

A    For two years.

Q    And then what happened?

A    It got to be spring and part of my responsibility was to teach in the high schools. The high schools - - I mean, the school system of course break for summer and then they let - - we went - - I went down to five hours a week and then I thought - - just for a couple of weeks.  I said this is ridiculous and I just went ahead and resigned altogether.

Q    So, you were only at the five hour a week, a week mark for a matter of weeks?

A    Yes.  Maybe two or three - - maybe a month - - maybe, maybe.

Q    And so, by that point, you were still down at the 180 mark, as far as your weight,

or had you gone back up?

A    I, I honestly don't know.  Really, I don't know.  I don't know.  I know it was up and down all of the time for a long, for a long time.

\*          \*          \*

ALJ    Let me - - when did you start getting treatment for - - taking thyroid supplement?

CLMT    Not - - okay - - that, that was diagnosed in March of '95.

ALJ    Of '95.  So, you started - -

CLMT    And he, and he started me on Synthroid.

ALJ    Right.  Okay.

CLMT    However - - okay, okay.  I'm sorry.  Okay.

Q    Did you have some problems with the Synthroid?  Was that - -

A    Yeah, yes.  They - - the one physician had me on .1mg and I stayed with him for a year.  I went to another doctor.  I didn't feel - - so, I went to another doctor.  And then he put me on higher doses, like,  .125 and then 1.2.  It was too high then.  Then I went to - - they, they just couldn't get me regulated.  Then in December of '96 I started with this primary care center and I was - - they started me on a .88 that - - so, my dose was not stabilized until October of '97.

Q    Okay.

A    From March of '95 until October of '97, I was on all kind of doses of Synthroid.

Q    And during that time, your weight would have fluctuated as a result?

A    Everything fluctuated.  Well, one way you're hyper, the other way you're completely sluggish.

\*          \*          \*

Q       In 1996 - - I'm not asking you what diagnosis you had, but looking at symptoms and the ways in which that affected you - - would you have been able to work in 1996?

A       No.

Q       Why not?

A       I, I'm - - I wouldn't have because I - - or I wouldn't have stopped in '95 because I was responsible for people in my job and I couldn't take care of myself.  I wasn't going to go out there and pretend to take care of others.   I wasn't taking care of myself.  Now I see that.  I couldn't - - I really - - I didn't see that then, but physically I was so ill and, and I tried to take some courses and I didn't even make - - you know - - keep my courses in 1996.  I tried to take some graduate level classes just keep some - - you know - - some type of activity going for me and I had to take incompletes in all that.  I didn't even make it to those classes.

Q       Okay.  Same question in 1997?

A       No.

Q       Is it the same answer?

A       Yes, um-hum.

Q       All right.

A       And, and I just - - now, I see I progressively got worse with everything year to year until I finally got to my doctor now that has treated me - - that I was honest with when he's treated me.  And I'm doing what he says to do.

Q       Okay.

A       But not, of course, then my - - everything - - my legs are totally - - everything is

worse, too.

Q      Now, the obvious question is that, if you believe that you were disabled in 1995 or the latter part of '95 at least, why didn't you file for disability or some other sort of assistance?

A      I didn't, I really didn't want to.   I just didn't want to.  I, I didn't know.  Like I said, I didn't know I was that ill.  And I didn't want to do that.  I didn't know if I - - didn't think that something like that couldn't happen - - could happen to me or - - I, I just, I just didn't want to.

Q      Okay.

A      I just thought, probably these things would come to pass and that I would get to a point someday that I could work again.  But it was one thing - - it's one thing after another to the point that I can't - - I couldn't ignore it anymore.  I mean, it's, it's absurd that I, I - - I'm an intelligent person.  I certainly should have applied them.  And people mentioned it to me and I just wouldn't hear it.

Q      What about 1996?

A      No, I just, I just constantly - - I just kept thinking - - you know - - these things, these things all will pass.  And they didn't and I do know that - - and I wanted to try to go to graduate school and  - - I mean, I don't know.  My husband was laid off from work there from about '95 to '98 so, we, didn't even have an income.  We didn't - - we had no income, we had no health insurance.  So, I don't know.  I - - we just  - - I mean, I had to be very selective and we had no money to - - for me to go to a - - really a good doctor.  It would have been the best time to apply for disability, but still I just thought - - like I said - - I was much sicker than I knew I was.

I was sicker than I knew I was.

Q        Why didn't you apply in 1998?

A        I still thought - - to this day I still get my, my annual nursing license.  To this day,

I will get it.  I just always - - I just - - I guess it's hope.  I just keep hoping maybe something will

get turned around.  I just - - you know - - and I just didn't.  I just didn't want to do that.  And

because once you're labeled disabled, it's not - - I would think it would be impossible to get a

job - - almost.

Q        What about in 1999?

A        No.  I just - - I , I didn't want to - - and, and I didn't even want to acknowledge I

had the problems that I had.  I didn't want to acknowledge it.  And I didn't until 2000.  Until I

went to see the doctor that I'm with now.

Q        So, why not in 2000?

A        Actually, we were working on that and I was, I was, I was with my dad in Florida

and the (INAUDIBLE) called and said your husband's gone crazy and I had to fly home and I

was scheduled for an appointment with Dr. Kupp in June of 2000 and my husband had his first

psychotic break.  And so, that - - of course, I felt I needed to be with Joe.  So, I cancelled that

appointment and then, I did go with - - to be with Dr. Kupp in October/November of 2000.  And

he, he - - and he has always tried to keep me enthused about trying to work, as well.  And my - -

well, I'm not - - I don't know if I can explain this very well.  So, I, I just, I just didn't want to do

that.  I just didn't want to do it.

[EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 153)

Q        Let me ask you - - did you - - after you stopped taking classes at - - your graduate

school classes - - did you take any classes after that?

A     I did, sir.  I tried - - I even tried - - I took some courses at Mawn County Tech Ed Center.   Just, just like, Introduction to Computers.

Q     When was that, if you remember?

A     I, I think - - I would - - that would be from, like, '97 to about 2000.  I would try to take one or two classes - - you know - - sign up for it.  Like, floral - - flower arranging.   Just to be social.  Just to get out of the house because I never would even go out of the house.  And I would go to a couple and then I would stop those.

Q     Why would you stop them?

A     I, I would just lose interest.  I just didn't want to go.  Just lose interest and, and still I - - you know - - this sounds cliche, but I just never felt well.

Q     Well - -

A     I never felt well.

Q     Okay.  Let me ask you - - just because Mr. Kernoot was asking about May 2000 and in the record - 4F page 8 - - it's a doctor visit from May 20, 2000.  And this is - - you had the anemia in, in February, I guess - - January, February they found it.

A     Correct.

Q     So, they put you on medication and, and it - - here's - - you're being evaluated and this is your - - it says patient - - this is under the S, which is where they put what you tell them - - patient taking medications as directed and denies complaints, no fatigue or pain.  Is that accurate?  That's inaccurate?

A     I saw this doctor - - I think that was Dr. Craig.  He came down from Pittsburgh

once a month and I saw him because he was just basically - -

Q     Well, so you lied to him?

A     No, no, no, no, no, no - - he, he didn't put down what I was saying.

Q     Okay.

A     No.  No, I've not lied.  I don't so what I - - I mean - -

Q     Well, no, I - -

A     - - I didn't refuse - -

Q     - - I'm just trying to understand.  So - -

A     Yeah.

Q     - - well, either he put it down wrong - -

A     Yeah.

Q     - - or, or you told it to him wrong.

A     No, right.

Q     You know what I mean?  There's, there's - - or, or something or - -

A     He, he, he was one that - - I probably chose to go to him because I didn't want to deal with all - - my distress and that was fine with him.

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ AND ATTORNEY]  (Tr. 159)

Q     Okay.  I'm going to give you a, a hypothetical.  I'm going to ask you to answer to different exertional levels.  So, I'll just do it all at once.  If you assume an individual of the claimant's age, education and vocational experience and assume the individual could perform work at the medium level, but also at the light level and should not be exposed to heat - - excessive heat, cold or humidity and requires an environment clean of - - free of pollutants  - -

excessive pollutants, chemicals, dust, fumes or poor ventilation.  And, in addition, the work

should be low stress work and in this case, I would mean by that, unskilled work, routine and

repetitive work with minimal changes to the routine or setting or procedures involved in the

work.  And dealing primarily with things and not people.  Would there be work in the national or

one of the regional economies that such an individual could perform?

A      Yes.  May I have a few moments, Your Honor?  I'm ready, Your Honor.

Q      Okay.

A      Your Honor, considering the hypothetical you've given me of to take into

consideration a person with similar profile as to the claimant, someone able to perform at the

medium level, also at the light level, unskilled and also the other factors in your hypothetical - -

would leave me to opine that jobs would exist in the national economy and also in the state of

West Virginia consistent with that.  At the medium level, you have the position of a janitress - -

at least a million and a half jobs in the national economy and at least 15,000 jobs in the state of

West Virginia.  Also, at the medium level, unskilled - - the position of a hand packager - -

150,000 jobs in the national economy and at least 1,400 in the state of West Virginia.  At the

light level, unskilled - - the position of light housekeeping - - 889,000 jobs in the national

economy - - at least 10,000 jobs in the state of West Virginia.  Also, at the light level, unskilled -

- the position of cafeteria attendant and food counter worker - - 343,000 jobs in the national

economy and at least 1,300 in the state of West Virginia.  All consistent with the DOT, Your

Honor.

Q      Okay.  Let me ask you - - if you added to that that because of fatigue or other

impairments, the individual would have to take breaks outside of scheduled breaks for a total of

one hour during the work day, would that change your answer?

A    Yes, it would remove all the jobs I mentioned as well as preclude any other jobs that might exist.

Q    Okay.  Thank you.

ATTY    Mr. Panza, I had a hard time hearing you.  I understood that in response to the Administrative Law Judge's hypothetical at the light exertional level, that you had included the job of light housekeeper?

VE    Yes, um-hum.  Light housekeeping.

ALJ    Keeping.

VE    It's a hotel,  motel - -

ATTY    Okay.

VE    - - housekeeper.

ATTY    Thank you.  I was - -

ALJ    You know, I've never thought of that.

CLMT    I thought that, too.

ATTY    I thought that they - -

VE    That, that always causes confusion.

ALJ    I've never - - that's funny.

ATTY    I'm sorry.  I understand now.

VE    Someone that works in the hospital is a light housekeeper.

ATTY    I - -

VE    It's, it's light janitorial service is what it amounts to.

ATTY          I, I got you now.  I, I was just wondering about the number of lighthouses that we still have.

VE          Yeah, right.

ALJ          Do they have those jobs for lighthouse keeping?

VE          I don't know.

ATTY          No.

ALJ          You ever recommend - -

VE          I'm sure there are, but I don't know if they exist or where they exist.  But if there are, there aren't very many.

ATTY          Yeah.  I, I understand now.  Thank you.  I also had a question with respect to the - - I understood that, in response to the Judge's hypothetical - - but first let me go back because maybe I misunderstood or wrote it down wrong.  I understood the Administrative Law Judge to have asked both - - at both the exertional levels and then had added certain additional restrictions, which I understood to have been no temperature extremes or humidity extremes and then no environment - - I, I wrote it down that way - - I think that the Judge had said excessive pollutants or - -

ALJ          Yeah.

ATTY          - - I don't remember how that was phrased.  And then go on to say low stress jobs and, and I understood the Judge to have defined what he meant by low stress jobs. And I'm curious about the janitor job at the medium exertional level in light of the restriction concerning various sorts of atmospheric pollutants or atmospheric fumes and that sort of thing.

VE          Well, there is a certain amount of that in terms of the detergents and so

forth.  It all depends upon the degree to which you wish the environment to be.  There is a certain amount of fumes and odors.

        ALJ        I used the word excessive so, maybe that's a little vague.

        VE        Yeah, okay, okay.

        ATTY        Well, I mean - - and, and you would agree that in addition to the fumes, the, the whole nature of being a janitor would involve some, some exposure to, to dust and - -

        VE        Some.

        ATTY        - - those certain things, right?

        VE        Some.

*       *       *

E.        <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.[8]  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

•        Attended graduate school classes.  (Tr. 154).

•        Attended courses in flower arranging at Mawn County Tech Ed Center.  (Tr. 154)

•        Rode indoor bicycle.  (Tr. 165)

•        Able to walk one mile.  (Tr. 348)

•

---

[8] Claimant's record did not include a Function Report.  Accordingly, evidence of Claimant's lifestyle is limited to statements made by Claimant to medical sources and to the ALJ.

### III.  The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant argues 1) the ALJ erred in assessing her credibility because he improperly concluded from the nine-year delay between Claimant's alleged onset of disability and her filing for benefits that Claimant was only partially credible;  2) the ALJ erred in concluding Claimant's hypothyroidism and its symptoms were not disabling; 3) the ALJ was prejudiced and biased against Claimant.

Commissioner contends the ALJ reasonably relied on the delay between Claimant's alleged onset of disability and her filing for benefits as evidence she was only partially credible. Commissioner also argues the ALJ properly concluded none of Claimant's impairments, including her hypothyroidism, prevented her from working.  Finally, Commissioner argues there is no evidence the ALJ was prejudiced or biased against Claimant.

B.      The Standards.

1.      Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.      <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u>, 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.      <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.      <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.      <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the

Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8. <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion

    1.    Whether the ALJ Erred When Assessing Claimant's Credibility.

Claimant alleges the ALJ erred in assessing her credibility because he improperly concluded the nine-year delay between Claimant's alleged onset of disability and her filing for benefits suggested she was only partially credible.  Commissioner argues the ALJ properly relied on the delay in concluding Claimant was only partially credible.

As the record reflects, Claimant filed for disability benefits on February 4, 2004, nearly 4 years after her alleged onset date of June 2, 2000 and nearly 9 years after her amended alleged onset date of June 30, 1995.  The ALJ relied, in part, on this delay when concluding Claimant's allegations of fatigue, sinus problems, irritable bowl, headaches, nausea, and depression were only partially credible.  (Tr. 98).  The ALJ specifically concluded "the claimant's escalating complaints since February 2004 as to an alleged total, ongoing nine-to-ten year disability - absent the filing of any disability application for nearly nine of those years and in view of her initial contention that she had only been disabled since June 2000 (the last months during which she remained insured for benefits) - serve to render her underlying credibility initially suspect." (Tr. 92).  The ALJ then concluded that while Claimant had medically determinable impairments capable of causing her subjective symptoms, the evidence did not support the frequency or degree of symptoms alleged by Claimant.  (Tr. 98-99).

Claimant alleges she delayed filing for benefits because she equated filing for benefits with failing.  (Def. Br. p. 3).  Claimant also explains she originally alleged an onset date of June 2, 2000 because that was the date recommended by the social security worker overseeing Claimant's application.  (Id. at p. 4).  Finally, she explains she amended her onset date to June

30, 1995 after discussions with her attorney because June 30, 1995 reflected the date she ceased all employment "because [she] was sick all the time." (Id.).

The Court finds Claimant's allegation regarding the ALJ's credibility analysis is without merit. First, the ALJ, when assessing the credibility of Claimant's subjective symptoms, was permitted to consider the gap between Claimant's alleged onset date of disability and the date Claimant filed for disability benefits. See 20 C.F.R. § 404.1529(c)(3) [the ALJ may consider "all available evidence" when evaluating the intensity and severity of a claimant's symptoms]; see also Craig, 76 F.3d at 585. Second, the ALJ did not rely solely on the delay between Claimant's alleged onset date and her filing date when concluding Claimant was only partially credible. Rather, the ALJ, in compliance with Craig, 76 F.3d 585, 595, considered all the evidence relevant to determining the severity of Claimant's impairments. Specifically, the ALJ considered the entire medical record (Tr. 93-96); evidence Claimant retained the ability during the relevant period to walk a mile, attend graduate classes (although she received an "incomplete" in many if not all classes), and ride a bike (Tr. 146, 154, 165, 348); evidence Claimant's cognitive functioning appeared "adequate for a wide range of tasks." (Tr. 93). The Court finds the ALJ was particularly justified in relying on the latter evidence, because Claimant's applications, her testimony at the hearing, and her brief filed with the Court demonstrates she retains an extremely advanced level of cognitive functioning. Accordingly, Claimant's allegation is without merit.

2.      Whether the ALJ Erred in Concluding Claimant's Hypothyroidism and its Symptoms Were Not Disabling.

Although it is difficult to identify Claimant's precise argument, the Court reads Claimant's second argument to allege the ALJ did not properly assess the impact of her

28

hypothyroidism and its symptoms on her ability to work. In support of her argument, Claimant cites to numerous medical records which she alleges establish her abnormal TSH levels and her fatigue. Commissioner argues the ALJ properly concluded none of Claimant's impairments, including her hypothyroidism, prevented her from working.

The ALJ found Claimant's hypothyroidism was a severe impairment that did not meet the criteria of any Listing. (Tr. 90-91). The ALJ then reviewed the medical evidence and Claimant's testimony and concluded Claimant retained the RFC to perform "within a low stress, well-ventilated, clean air environment, a range of unskilled work that: requires no more than a medium level of physical exertion; entails no concentrated exposure to temperature extremes, humidity or pollutants; involves no more than a minimal changes in procedure, routine or setting; consists of routine, repetitive processes, instructions and tasks; and primarily involves things rather than people." While the ALJ found Claimant experienced some fatigue and moderate depression, he concluded she did not experience them to the "frequency or debilitating degree of severity alleged." (Tr. 98). (Tr. 99).

The Court finds the ALJ's conclusion Claimant's hypothyroidism and it symptoms were not disabling is supported by substantial evidence. While the records document Claimant's continued diagnosis of hypothyroidism and complaints of fatigue, (see Tr. 267-302, 516, 521), Claimant's allegation her hypothyroidism and its symptoms were disabling is not supported by the record and is contradicted by Claimant's lifestyle evidence. Specifically, the record establishes Claimant retained the ability to walk a mile per day, attend graduate courses, and ride a bike. (Tr. 154, 165, 348). Additionally, Dr. Franyutti, in his Physical RFC Assessment conducted in April 2004, concluded Claimant had no exertional, postural, manipulative, visual,

communicative, or environmental limitations, and no significant functional limitations. (Tr. 379). Based on the above evidence, the ALJ reasonably concluded that although Claimant suffered from severe hypothyroidism, her hypothyroidism and accompanying symptoms were not disabling.

   3.   <u>Whether the ALJ was Prejudiced Against Claimant</u>.

Claimant alleges the ALJ was prejudiced against her during the hearing and in writing his decision. In support of her argument, Claimant points to the questions asked by the ALJ at the beginning of the hearing - relating to where Claimant lives, with who she lives, where her husband worked - and alleges they were "irrelevant to [her] applying for SSDB, they are out of line." She also takes issue with the ALJ's repeated mention of the delay between Claimant's onset date of disability and her filing date for disability benefits, and alleges the ALJ is "indirectly [] saying he just does not believe someone could be totally disabled for 9 to 10 years and not file a SSDB claim." Claimant next takes issue with the ALJ's conclusion "the claimant's ability to complete by hand a number of application-related documents which describe her alleged condition and history in quite significant detail serve to indicate to the Administrative Law Judge that she even as of 2004 remained possessed of substantial concentration and cognitive abilities that would appear adequate for a wide range of tasks." (Tr. 93). Finally, Claimant alleges the ALJ evidenced his prejudice by erroneously concluding Claimant was capable of performing the jobs cited by the VE.

Commissioner argues Claimant's arguments are without merit. Specifically, Commissioner argues the questions asked by the ALJ at the hearing were reasonable and proper; there is no evidence of bias or improper behavior by the ALJ; and the ALJ reasonably relied on

the VE's testimony that the cited jobs accommodated Claimant's RFC.

The Court agrees with Commissioner and finds for the following reasons Claimant's allegations lack merit:

First, the questions asked by the ALJ at the hearing concerning Claimant's living situation and family were proper. Contrary to Claimant's belief, the questions were not directed at establishing Claimant applied for benefits simply for financial profit. Rather, the questions were aimed at constructing a context within which to analyze Claimant's alleged disability.

Second, as discussed above in Section I, the ALJ's consideration of the delay between Claimant's alleged onset date and her application for benefits was not unreasonable or suggestive of bias or prejudice.

Third, there is no merit to Claimant's allegation the ALJ was biased against Claimant simply because he found she could perform the jobs cited by the VE. While Claimant's RFC did include a limitation of "no concentrated exposure to temperature extremes, humidity or pollutants," (Tr. 99), and the VE did testify the jobs as janitress and housekeeper would expose Claimant to a "certain amount of fumes and odors" (Tr. 162), the ALJ reasonably concluded Claimant could still perform the jobs based on the VE's explanation that the amount of exposure "depends on the degree to which you with the environment to be." (Tr. 162). Even assuming the ALJ had erred in concluding the jobs as janitress and housekeeper accommodated Claimant's RFC, the ALJ would have nevertheless met his burden at step five because there remained two other jobs available to Claimant. See 20 C.F.R. § 404.1566(b) [establishing the ALJ satisfies his burden at step five by showing there exists even one job in significant numbers that accommodates Claimant's RFC]. Finally, here is also no merit to Claimant's assertion her

fatigue and resultant need for breaks rendered her unable to perform the jobs cited by the VE. Although the ALJ found Claimant suffered from "some fatigue" (Tr. 98), and while the VE testified the jobs would not accommodate an individual's need to for extra breaks totaling an hour (Tr. 160), the record does not support Claimant's assertion she suffers from such a debilitating degree of fatigue.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because substantial evidence supports the ALJ's credibility analysis; substantial evidence supports the ALJ's conclusion Claimant's hypothyroidism and its symptoms were not disabling; and there is no evidence the ALJ was biased or prejudiced against Claimant.

2.      Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: June 6, 2008

/s/ James E. Seibert
JAMES E. SEIBERT

32

UNITED STATES MAGISTRATE JUDGE